**Opinion issued October 29, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-01002-CR

————————————

**CHARLES EDWARD BARLEY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 506th District Court**
**Waller County, Texas**
**Trial Court Case No. 110513820**

---

## MEMORANDUM OPINION

A jury found Charles Edwards Barley guilty of the murder[1] of his wife,

Donna Jackson. After finding two enhancement paragraphs true, the trial judge

---

[1]  TEX. PENAL CODE ANN. § 19.02(b)(2) (West 2011) ("A person commits an offense if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual . . . ").

sentenced him to 50 years in prison. Barley's sole issue on appeal is whether the trial court erred by failing to require the State to redact portions of Barley's recorded statement admitting he had been in prison three times previously.

We affirm.

## Background

Charles Edward Barley lived with his wife, Donna Jackson, in Brookshire, Texas. One pre-dawn morning, Donna's son, Brandon Jackson-Blair, returned home after spending the night at his cousin's house. He walked in, noticed the back door was open, found his mother unresponsive in her bed, and called the police. Brookshire Officer Ryland responded to the call and confirmed that Donna was dead. She had scratches on her back and arm and blood coming from her nose. Officer Ryland found a machete near the bed but no other weapons. There was no blood on the machete. Lieutenant Garcia assisted with the investigation. As part of their investigation, the police sought to question Barley but could not locate him. Dr. Morna Gonsoulin performed an autopsy on Donna but was unable to identify signs of injury.

Three days after Donna died, Lieutenant Garcia received a call that Barley had turned himself in at the Houston Police Department. Barley agreed to be transported back to Brookshire where he was read his rights and voluntarily gave a recorded statement. Barley was not in custody at the time of the interview.

2

Throughout the interview Barley was adamant that Donna attacked him. He claimed she accused him of infidelity, became enraged, and chased him around the house with a machete. He repeatedly admitted that he grabbed her around the neck, squeezed "with all his might" and pushed her to the bedroom. There, the two fell to the floor. Though Donna no longer had the machete, Barley straddled her on the floor and continued choking her. He estimated that he choked her for an additional one to two minutes after she dropped the machete, during which time she did nothing because "there wasn't anything she could do." Once she was unconscious, he lifted her to the bed, put covers on her, then grabbed her car keys and left.

The police repeatedly asked Barley why he did not call them or an ambulance to check on Donna once he left the house and was out of danger. Barley very agitatedly answered, "Hell no. She attacked me." When pressed that she could have used the help he stated, "I don't care. The aggression—she brought it out of me. I wasn't calling anyone to come check on her." And again later: "I don't give a f— about her because she was trying to do harm to me. She tried to hurt me."

Barley also was asked many times why he did not stop choking her once she dropped the machete and was no longer an immediate threat to him. Each time Barley refused to answer the question. Finally, he offered this explanation: "I don't let nobody hurt me. I'm going to try to avoid you. But if you don't stop [inaudible]

get out of hand [inaudible] I'm going to stop you. I don't care who it is. If you push me to the point of no return, there it is."

Barley claimed to not have realized Donna was dead. He says he went to Houston, eventually calling his aunt to see if Donna had called her looking for him. When the aunt said she had not, he called his cousin who told him she was dead. He then called both the Brookshire Police Department and the Houston Police Department to see if there was a warrant for his arrest. During this time, Barley was using Donna's debit card to pay for hotel rooms in Houston, after hiding her car in a parking garage on Westheimer. When he eventually went to the police, Donna's account had been completely depleted.

In addition to Barley's explanation of how he choked Donna and left for Houston, Barley also made a couple of references to his criminal past during the interview. He told the police that his depression and emotional issues had been diagnosed in "TDC" and, in a later portion of the tape, that he could not have guns, presumably as a result of a prior conviction. Another statement referenced prison directly. The police asked him why he called asking if there was a warrant for his arrest. He answered:

Barley:     "I've been to prison how many times?"

Police:      "I don't know. You tell me."

Barley:     "Three times. You ask if there is a warrant for your arrest
             anytime there's [anything] questionable."

At no point did Barley elaborate on the past convictions. He never said what crimes had been committed or how long he was confined. The interviewing officers did not ask for more detail.

A more in-depth analysis was performed on the autopsy specimens after the police received this information from Barley. Dr. Sharon Derrick, a forensic anthropologist with the medical examiner's office, who has specialized training evaluating bone trauma, was asked by Dr. Gonsoulin to analyze the specimens. She found fractures to the hyoid bone and cricoid cartilage in Donna's neck. She explained, "Anytime the hyoid is fractured, it is a suspicious occurrence." These injuries, in her opinion, were consistent with "forceful compression of the neck."

Based on Dr. Gonsoulin's findings and Barley's statement, Barley was tried for murder. The jury charge included the offense of murder as well as the lesser-included offenses of manslaughter, criminally negligent homicide, aggravated assault, and deadly conduct. The charge also instructed the jury on the use of deadly force in self-defense. Barley did not testify in person at his trial, though the entire audiotape of his police interview was played for the jury.

Based on all the evidence presented, the jury found Barley guilty of murder. Barley elected to have the judge determine punishment. Barley's past criminal record caused him to be sentenced as a habitual offender with an applicable

punishment range of 25 to 99 years. The trial court sentenced him to 50 years in prison.

**Admissibility of Statements**

Barley challenges the trial court's ruling on his objection to the admissibility of his recorded statement. Specifically, Barley complains that certain portions of the recording should have been deleted or muted because they disclosed past criminal convictions. Barley's objection was overruled, and the statement was played to the jury in its entirety.

## A.  Admission of statement that Barley had been in prison three times was error

The decision to admit or exclude evidence will not be disturbed absent an abuse of discretion. *See Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1991) (en banc op. on reh'g). The question is whether the court acted "without reference to any guiding rules and principles," making the ruling arbitrary or unreasonable. *See id.* at 380*; Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). An accused may be convicted only by "evidence which shows that he is guilty of that offense alone[.]" *Martinez v. State*, 134 S.W.2d 276, 277 (Tex. Crim. App. 1939). Evidence that the accused committed other, unconnected offenses in the past generally is not admitted. *See* TEX. R. EVID. 403, 404; *Martinez*, 134 S.W.2d at 277.

There are at least three exceptions to this rule. First, evidence of prior offenses is relevant and admissible if the State offers the evidence as proof of motive, intent, identity, or for any other non-character purpose. TEX. R. EVID. 404(b). Second, when a defendant testifies in his own defense, other offenses may be admissible for the limited purpose of attacking the credibility of the testifying defendant. TEX. R. EVID. 404, 609. Third, statements revealing extraneous offenses are admissible if evidence of the other crimes "tends to connect [the accused] with the offense for which he is [on] trial." *Alvarez v. State*, 511 S.W.2d 493, 494–95 (Tex. Crim. App. 1973); *Martinez*, 134 S.W.2d at 277. The burden is on the State to show a valid use of otherwise inadmissible evidence. *See Montgomery*, 810 S.W.2d at 377–78. If no valid exception exists, it is error to admit the evidence. *See Martinez*, 134 S.W.2d at 277.

In response to Barley's objection, the State argued that (1) Barley was "a little late" objecting at trial given how long he knew the State intended to use the tape and the technical challenges to deleting portions of an audiotape on the day of trial, and (2) allowing the jury to hear the references to Barley being in prison would not be unfairly prejudicial because it "was of miniscule importance given the length and breadth of the overall statement." The trial court ruled that the issue "had nothing to do with . . . technology that may or may not exist" and held that the full confession was admissible because it was "voluntarily given by the

defendant after reading him his rights." But the proper question is not whether it was a voluntary statement.

The question is whether a valid exception to the exclusionary rule applies. TEX. R. EVID. 403, 404. The State did not argue one. Its position was not that the statements should be admitted based on an exception to the exclusionary rule, but rather that it was technologically too difficult to delete them from the recording with little notice. The prosecutor explained to the trial judge that he was "not sure that we have the technology to simply chop out a part of a digital recording . . . ."

The State's "technology" argument is without merit. Unless a valid exception applies, evidence of past convictions is inadmissible against a non-testifying defendant. *See Martinez*, 134 S.W.2d at 277. In *Martinez*, the accused voluntarily gave a written statement confessing to possession of marijuana with the intent to sell. *See id.* at 276. The last two sentences of his confession read: "I have been to Texas Penitentiary twice. Both times for burglary." *Id.* At trial, the defendant objected to the two sentences being read to the jury; the objection was overruled. *Id.* at 276–77. The Court of Criminal Appeals held that it was error to allow the entire confession to be introduced because none of the exceptions to the exclusionary rule applied. *See id.* at 277. The court noted that "the State might easily have pasted a strip of paper over the objectionable portion of the confession and thereby excluded it from the jury." *Id.*

Likewise, in *Alvarez*, an accused voluntarily gave a written confession in which he admitted to the crime charged, but he included in his statement information about an extraneous offense. 511 S.W.2d at 494. His murder confession included the following sentence: "I always carry a pistol with me because I shot and killed a man in Lubbock not too long ago and I am afraid of his people." *Id.* The trial court denied the defendant's evidentiary objection and admitted the complete statement with a limiting instruction that the evidence could be considered only for the purpose of showing identity, intent, motive, or scheme. *Id.* at 495. The appellate court found that none of the exceptions to the exclusionary rule applied; accordingly, the trial court erred in admitting the full statement. *See id.*

While it may be true that redacting a digital recording is more difficult than deleting sentences from a written statement, we conclude that it was required by the rules of evidence. *See* TEX. R. EVID. 403, 404; *Martinez*, 134 S.W.2d at 277. Having found that the failure to delete the statements was error, we now address whether the error was harmless.

## B.    Error was harmless considering entire record

An erroneous evidentiary ruling will cause a reversal of conviction only if the error affected the defendant's substantial rights. TEX. R. APP. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). We must consider

whether Barley's references to his prior convictions, in light of all the other evidence before the jury, had a substantial effect on the jury's determination. *See id.* Because we find the error had, at most, a slight effect, it was harmless and does not require reversal. *See id.*

### 1. Standard of review

Evidentiary errors are non-constitutional and require reversal only if they affected the complaining defendant's substantial rights. TEX. R. APP. P. 44.2(b); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). The error must have a "substantial and injurious effect or influence" on the jury's verdict. *See King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A substantial right is not affected if the reviewing court has a "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon*, 49 S.W.3d at 365. In other words, if there is a "grave doubt" that the result was free from the substantial influence of the evidence, then the defendant's substantial rights were affected. *See Burnett v. State*, 88 S.W.3d 633, 637–38 (Tex. Crim. App. 2002). "Grave doubt" means "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.*

When analyzing the likelihood that a jury's decision was affected by erroneously admitted evidence, we consider everything in the record, including the testimony and physical evidence admitted, the nature of the evidence supporting

the verdict, the character of the alleged error and how it might be considered in connection with the other evidence, the jury instructions, the State's and defendant's theories of the case, and closing arguments. *See Motilla v. State*, 78 S.W.3d 352, 355–56 (Tex. Crim. App. 2002). It also is relevant whether the State emphasized the error in closing argument or otherwise. *See id.* Lastly, the presence of overwhelming evidence supporting a finding of guilt is a legitimate factor in evaluating the harm the error caused. *See id.* at 356 (explaining the court's prior ruling in *Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989)).

### 2. Applying the factors to the record

Barley argues that information about his past convictions could have substantially affected the jury's decision to find him guilty of murder instead of either accepting his self-defense argument or choosing a lesser-included offense, such as criminally negligent homicide. In light of this claim, we review the entire record and apply the *Motilla* factors to determine what effect the erroneously admitted statements may have had on the jury's determination of guilt. *Motilla*, 78 S.W.3d 355–56.

#### a. Theories of the case

The first factor we consider is the State's and defendant's theories of the case. *See id.* The State argued Barley committed the offense of murder, which—as described in the jury charge—required that Barley "intend[ed] to cause serious

bodily injury and commit[ted] an act clearly dangerous to human life that cause[d] the death of an individual."[2]

Barley's theory was self-defense. The jury charge included an instruction on the law of self-defense, explaining that a person can be justified in using deadly force "when and to the degree he reasonably believes deadly force is *immediately necessary* to protect himself against the other's use or attempted use of unlawful deadly force." (Emphasis added.) The jury was told to consider "all relevant facts and circumstances surrounding the killing [including] the previous relationship existing between the accused and the deceased . . . [and] the condition of the mind of the defendant at the time of the offense."

In the interview, Barley never explained why he did not stop choking Donna once she was no longer an *immediate* threat, even though the interviewing officers asked him repeatedly. Often he refused to answer the question. Only at the end of the interview did he finally say, "I don't let nobody hurt me. I'm going to try to avoid you. But if you don't stop [inaudible] get out of hand [inaudible] I'm going to stop you. I don't care who it is. If you push me to the point of no return, there it is." After admitting he choked her for one to two minutes after she dropped the machete, he said, "I was pissed. I've got a button. If you push it the wrong way, I

---

[2]     This definition matches that found in the Texas Penal Code. *See* TEX. PENAL CODE ANN. § 19.02(b)(2) (West 2011).

am going to respond. I can't help it. I'm not going to let anyone push me the wrong way."

The competing theories required the jury to consider the facts surrounding Donna's death and Barley's state of mind at the time he killed her. The challenged evidence did not directly relate to the parties' theories or the issues before the jury. Accordingly, this factor favors a finding of harmless error.

### b. Evidence of guilt

A jury may consider a defendant's attitude during his police interview when assessing guilt. *See id.* at 355–56, 359. Further, an intention to commit murder reasonably can be inferred when a defendant is hostile and shows no empathy or remorse during his police interview. *See id.* at 359; *Darby v. State*, 145 S.W.3d 714, 721 (Tex. App.—Fort Worth 2004, pet. ref'd) (holding that lack of remorse is evidence from which jury can infer intent). Overwhelming evidence of guilt will favor a finding of harmless error. *See Motilla*, 78 S.W.3d at 356–60.

In *Motilla*, evidence was erroneously admitted during a murder trial. The Court of Criminal Appeals held that it was appropriate to examine the evidence of the defendant's guilt as one factor in its substantial harm analysis. *See id.* at 358. The court held that the defendant's demonstration of "contempt, defiance, and apathy during the interview rather than remorse" could be considered by the jury as

evidence that he did not regret his crime, and even as evidence that he intended to commit the murder. *See id.* at 359.

Ranger Luna testified about Barley's hostility during the interview. Barley "seemed to get upset when we talked to him and leaned forward and I thought there might be some altercation during the interview." The police asked him repeatedly why he did not call them or emergency services to aid Donna after he left, if he really believed she was still alive. Barley was very defiant, showing no remorse in his responses, often saying, "Hell, no . . . she was trying to hurt me" also "I don't care! The aggression—she brought it out of me. I wasn't calling anyone to come check on her."

His demeanor was the same when asked why he continued choking her once she dropped the machete. He repeatedly said he "did not care" if she was fighting back or not after she dropped the machete. He reasoned that it did not matter because she was the one who attacked him: "I was pissed! I've got a button. If you push it the wrong way, I am going to respond." Again, "I don't care who it is. If you push me to the point of no return, there it is."

When asked what she was doing as he choked her, he responded: "She wasn't doing [anything] because there wasn't anything she could do." He continued, "What do I care? . . . I don't care. She attacked me, chasing me with a machete. That set everything in motion. I was in a rage. I'm not going to let anyone

14

push me . . . I don't give a f— about her because she was trying to do harm to me. She was trying to hurt me." Later he said he "hasn't shed a tear" and does not know why, explaining that it is like he has a "blockade" and is not "processing" what happened.

A reasonable jury could interpret Barley's hostility in the interview, apathy, and lack of remorse as evidence of intent or, at a minimum, as evidence Barley realized the immediate danger had passed yet continued using deadly force against Donna. *See* TEX. PENAL CODE ANN. § 19.02(b)(2); *see also Motilla*, 78 S.W.3d at 359 (holding defendant's demeanor in police interview is relevant to jury's determination of intent to commit murder). Furthermore, the jury could infer guilt from the fact that Barley fled, hid Donna's car, then hid in Houston for several days after he choked her. *See Burks v. State*, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994).

Likewise, the inconsistencies between Barley's statements in the interview and those of the other trial witnesses could affect Barley's credibility with the jury. Donna's son, Brandon Jackson-Blair, testified that, when he left the house the night before her death, Barley and his mother were arguing because Barley had been drinking earlier in the day and "wanted some money." Jackson-Blair testified that Barley appeared to be under the influence of alcohol or drugs, that he had previously seen Barley in that condition, and that he had seen him smoke crack

15

cocaine many times. Jackson-Blair had seen him smoking crack cocaine and drinking shortly before the argument and knew Barley had been in the neighborhood looking for crack cocaine earlier that day. Barley admitted in his statement that he was drinking on the day of the fight and that he was a frequent user of crack cocaine; however, he denied using drugs that day.

Officer Ryland testified that he did not find any additional machetes or other weapons at the house. In contrast, Barley's self-defense claim was based in part on his assertion that there were multiple machetes in the home and Donna could have picked up another one had he stopped choking her. Further, Donna had scratches on her back and arm and blood coming from her nose. Yet Barley said in the interview that he did not scratch Donna or hit her.

Donna's daughter, Nasha Jackson, testified that Barley did not contribute financially to his marriage and that he lived off Donna. She confirmed that Barley had access to the PIN number to Donna's debit account and that the account was emptied through various withdrawals in the Houston area between the date her mother died and the date of Barley's interview. Yet Barley told the police officers that he had a job and had money to pay for his hotels and expenses while in Houston.

Further, Barley stated in his recorded interview that he continued to choke Donna for one to two minutes after she already dropped the weapon, that she was

16

not doing anything to defend herself at this point because "there wasn't anything she could do," yet he did not stop. He continued to choke her "with all his might" until she was unconscious. And he never looked back. He left for three days, depleting her account, calling to check if there was a warrant for his arrest, then finally appearing at the police station with an explanation.

There is significant evidence of guilt, based on (1) Barley's own description of the events and his state of mind at the time, (2) the inconsistencies between Barley's statement and those of the witnesses as well as within Barley's statement itself, and (3) the impression Barley's hostile demeanor likely had on the jury where he showed apathy towards Donna's injuries and death instead of remorse. This factor weighs in favor of finding the evidentiary ruling to be harmless error.

### c. Character of erroneous evidence

The next factor we consider is the character of the erroneously admitted evidence and how it might be considered in connection with other evidence in the case. *See Motilla*, 78 S.W.3d at 355 (citing *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000). The key issue in the trial was Barley's intent either to commit murder or to merely defend himself. The challenged evidence of past convictions had no connection to Barley's intent. Barley said in his statement that he had never hit or been violent to a woman before this incident. Accordingly, it would have been unreasonable for the jury to presume a prior domestic violence

17

conviction. It is far more likely that, if the jury even wondered, it would have suspected drug convictions. This is because Barley stated in the interview that he had a long history of drug use and that his two previous marriages ended, in part, because he used a lot of drugs and could not be the man of the house that was needed. Also, he admitted he used crack cocaine often.

Because there is little connection between the extraneous evidence and the evidence that was the focus in the case—the facts surrounding Donna's death and Barley's state of mind—we hold that this factor supports a finding of harmless error.

### d. Whether the State emphasized erroneously admitted evidence

The final factor is whether the State emphasized the error in closing argument or otherwise. *See Motilla*, 78 S.W.3d at 355 (citing *Llamas v. State*, 12 S.W.3d 469, 471 (Tex. Crim. App. 2000)). The State did not. We find no indication in the record that any attorney or witness drew attention to Barley's statements about prison or made any reference to his past criminal record during the guilt-innocence phase of the trial. This factor also favors a finding of harmless error.

We conclude, based on the record as a whole, that Barley's statements about prison—made more than half way through the audiotaped interview—did not have a substantial effect on the jury's determination. Instead, we believe they had no

more than a slight effect.  Accordingly, we hold that the error in admitting the evidence was harmless.[3]

## Conclusion

We affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Do not publish.   TEX. R. APP. P. 47.2(b).

---

[3]     The trial court gave this instruction to the jury: "There may be matters contained in the [defendant's] statement that are uncorroborated by other evidence or testimony. You are instructed that statements of the defendant, if any, are subject to proof beyond a reasonable doubt." Because the error is found to be harmless, it is not necessary for the Court to determine whether the instruction was adequate.